1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DESIREE ANN GARCIA,<br><br>                Plaintiff<br><br>        v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>                Defendant. | Case No. CV 14-02528-GW (KS)<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

On December 9, 2014, Plaintiff, Desiree Ann Garcia ("Plaintiff"), filed a Complaint seeking judicial review of a denial of her application for Social Security Disability Insurance benefits and Supplemental Security Income ("benefits".) ("Complaint," ECF No. 1.) On August 19, 2015, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Consents, ECF Nos. 17, 19.) On August 6, 2015, the parties filed a Joint Stipulation ("Joint Stip.," ECF No. 15), whereby Plaintiff seeks reversal of an Administrative Law Judge's ("ALJ") decision to uphold the denial. The Court has taken the Joint Stipulation under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

Plaintiff, who was born on March 14, 1970, alleges disability since September 1, 2010, due to systemic lupus erythematosus ("SLE" or "lupus"), membranous nephritis, and degenerative disc disease.   (Complaint at 2; A.R. 24; 32; 197.) Plaintiff's past relevant work experience was as a babysitter or child monitor, landfill supervisor, sales attendant, and sandwich maker. (A.R. 70.)

Plaintiff's application for benefits was denied initially and also upon reconsideration.  (Complaint, at 2.)  She timely requested, and received, a hearing by teleconference before Houston-based ALJ Vadim Mozyrsky, on March 11, 2013 (A.R. 39-74.)  Plaintiff was represented by counsel and testified before the ALJ at his hearing.  (*Id*.)  A vocational expert ("VE") also testified at the hearing.  (*Id*.) Presented with a hypothetical based on limitations prescribed by the state agency examining physicians, the VE testified that Plaintiff would be able to perform her past relevant work as a landfill supervisor and sales attendant. (A.R. 71.)  Presented with hypotheticals based on the more restrictive limitations prescribed by each of Plaintiff's treating physicians, however, the VE testified that Plaintiff would not be able to perform her previous jobs, or any other work.  (A.R. 87.)

On April 5, 2013, the ALJ denied Plaintiff's claim, finding that although Plaintiff was severely impaired due to SLE, membranous nephritis, and degenerative disc disease, and suffered other non-severe impairments, she nevertheless retained the residual functional capacity ("RFC") to perform her past relevant work, albeit at a slightly reduced range—and was therefore not entitled to benefits.  (A.R. 22-26.)

Specifically, the ALJ adopted the less-restrictive limitations prescribed by the state agency physicians and determined that Plaintiff had the RFC to perform light

work as limited to lifting and carrying 25 pounds occasionally and 20 pounds frequently; standing and walking for 6 hours out of an 8-hour workday; sitting for 6 hours out of an 8-hour workday; occasional climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs; and frequent balancing stooping, kneeling, crouching, and crawling.[1]  (A.R. 25-26.)

The ALJ's decision became final on October 14, 2014, when the Appeals Council declined to set aside the ALJ's unfavorable decision.  (A.R. 6.)  Plaintiff then filed her complaint in this action.

## DISPUTED ISSUES

Plaintiff contends that the ALJ improperly (1) disregarded the functionality assessments of both Plaintiff's treating physicians, and (2) discredited Plaintiff's subjective complaints.  (Joint Stip. at 6.)  Plaintiff requests that the ALJ's decision be remanded for a new hearing and decision.  (*Id.* at 28.)  Defendant asks that the Commissioner's decision be affirmed and the complaint dismissed.  (*Id.*)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the ALJ's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007.)  "Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir.

---

[1] The ALJ also found that, considering Plaintiff's age of 40 years at the alleged onset date (A.R. 197), her education, work history, and residual functional capacity, she could make an adjustment to other work existing in significant numbers in the national economy.  (A.R. 32-33.)  The finding is not challenged in the instant case.

2014) (internal quotation marks and citations omitted.)  "Even when the evidence is susceptible to more than one rational interpretation, [reviewing courts] uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012.)  Where the ALJ has properly considered all of the limitations for which there is record support, the ALJ's RFC determination will not be overturned so long as the ALJ applied the correct legal standard and the RFC assessment is supported by substantial evidence. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005.)

Although this Court cannot substitute its discretion for that of the ALJ, it must nonetheless review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted.)  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995.)

The Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003.)  However, the Court will not reverse the Commissioner's decision if it is based on harmless error, which exists when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r of Soc. Sec*., 454 F.3d 1050, 1055 (9th Cir. 2006.))

*//*

*//*

*//*

4

## THE EVIDENCE

### Treating Physician, Dr. Mueller's Records and Assessment.

Dr. Mueller, MD was Plaintiff's treating physician specializing in family medicine.  (A.R. 223.)  Dr. Mueller saw Plaintiff every two months between January 1, 2011 and August 23, 2011, and prepared treatment notes which are in the record. (A.R. 223; 406-24.)

Dr. Mueller's treatment notes are, for the most part, indecipherable due to illegible handwriting.  However, it is possible to make out repeated references to the following terms in either the section on "present illness" or "assessment" in the treatment notes: "lupus," (A.R. 408-09, 412, 413, 416, 417, 422, 424); "lupus nephritis" (A.R. 412, 417); "hurt all over esp[ecially] back [and] hip, knees[,] ankle" (A.R. 412); "more stiffness" (A.R. 409); "more pain in hand elbows" (A.R. 413); "persistent pain in hands elbows … shoulders…HTN…" (A.R. 416); "[right] hip pain continues" (A.R. 422); "glomerulonephritis" (A.R. 412); "HTN" (A.R. 412, 416); "anxiety" (A.R. 413, 416); "vertigo" (A.R. 418, 422, 424); and "sleep apnea" (A.R. 424).  Dr. Mueller's treatment notes, when decipherable, also consistently list the medications prescribed to Plaintiff as including: "valium," "prednisone," "Vicodin," and "Xanax." (A.R. 412, 413, 416, 417.)

The results of x-rays which are typewritten and also part of Dr. Mueller's treatment record contain the following impressions: (1) "no acute fracture" in the right hip, and (2) "no significant abnormality of the lumbar spine," from a January 17, 2012 x-ray, and (3) "negative right hip" after a November 17, 2010 x-ray of the right hip. (A.R. 410-11; 423.)  A "carotid evaluation" from an ultrasound resulted in the following findings: "Real-time imaging of the carotid systems reveals plaquing

of the right bulb.   Doppler analysis reveals normal peak systolic velocities bilaterally.   Vertebral flow is antegrade bilaterally," and "0-39% stenosis of the internal carotid arteries bilaterally."  (A.R. 420-21.)  It is not entirely clear as to what the significance, if any, is of the other test results in the record.  (*See, e.g.* A.R. 415; 419.)

Dr. Mueller completed two Multiple Impairment Questionnaires, provided by Plaintiff's counsel, dated February 23, 2012 and February 23, 2013. (A.R. 426-33; 458-65.)   In the first Multiple Impairment Questionnaire Dr. Mueller referenced diagnoses of SLE, glomerulonephritis, hypertension, vertigo, and anxiety, supported by clinical findings of  hand deformities and depigmentation and tenderness on grasping of the hands, with diagnostic testing consisting of a positive ANA titer in May of 2008.  (A.R. 426-33.)  Plaintiff's prescribed medication as listed by Dr. Mueller included: morphine, Vicodin, valium, prednisone, and Xanax. (A.R. 430.)

By way of limitations, Dr. Mueller assessed that, in a regular, eight-hour workweek, Plaintiff could sit up to six hours a day and stand/walk between two and three hours a day, with the need to get up and move around hourly for up to an hour each time; that she could lift up to five pounds frequently and ten pounds occasionally and carry up to 20 pounds occasionally and no weight frequently; with moderate limitations on her abilities to perform gross and fine manipulations and to reach.  (A.R. 428-30.)  He added that her symptoms would frequently interfere with her attention and concentration; that she would be incapable of tolerating even a "low stress" work environment; that she would need to take 10- to 15-minute breaks at unpredictable intervals; and that she would likely miss more than three workdays a month due to her symptoms.[2]  (A.R. 431-32.)

---

[2] Dr. Mueller also assessed a need to avoid wetness, noise, temperature extremes, humidity and heights on a sustained basis.  (A.R. 432.)

In the second Multiple Impairment Questionnaire, Dr. Mueller updated his diagnosis to SLE, anxiety, nephritis, and irritable bowel syndrome, supported by primary symptoms of "all over" pain, especially in Plaintiff's back and extremities, as well as cramps and stiffness in the hands.  (A.R. 458-65.)  Dr. Mueller listed some of the same prescription medications and also added a few new ones, promethazine, and Lidoderm.  (A.R. 462.)  By way of limitations, Dr. Mueller assessed that Plaintiff could sit no more than two hours in an eight-hour day; stand and/or walk no more than one hour; that she would need to get up every 10 minutes and move around for five minutes each time; that she could lift and carry no more than five pounds frequently and ten pounds occasionally; that she has marked limitations in her abilities to perform gross manipulations and to reach; that she has moderate limitations in her ability to perform fine manipulations; that her symptoms would "constantly" interfere with her attention and concentration; that she suffers anxiety secondary to her pain that further affects her symptoms and her functional limitations; and she would be incapable of tolerating even a "low stress" work environment; that she would have to take 30-minute breaks every 15 to 20 minutes; and that she would likely miss more than three workdays a month.  (A.R. 460-64.)

### Treating Physician, Dr. Ahluwalia's Records and Assessment.

Plaintiff first saw Dr. Ahluwalia, MD, a specialist in internal medicine and rheumatology, on March 30, 2010, based on a referral by Dr. Mueller.  (A.R. 402-03.)  Dr. Ahluwalia's treatment notes span from March 30, 2010 to May 4, 2012.  (A.R. 434.)  The results of X-ray and lupus labs that Dr. Ahluwalia ordered on March 30, 2010, which indicated "[m]ild degenerative disc disease," and "slight loss of normal cervical lordosis either related to the patient's positioning or spasm." (A.R. 404.)  Dr. Ahluwalia's clinical impression recorded in his consultation notes from March 30, 2010, indicated that Plaintiff had a history of SLE, vitiligo, and

1  fibromyalgia.  (A.R. 403.)  His notes also reflected obesity and vitiligo but no oral

2  ulcers, joint tenderness, or limitation of joint motion.  (A.R. 403.)

3

4       At a follow up examination on April 6, 2010, Plaintiff complained of

5  worsening joint pain with occasional hand swelling and Dr. Ahluwalia's

6  examination revealed "trace synovitis in the index, longer finger, and MCP and PIP

7  joints bilaterally with tenderness," and once again he diagnosed Plaintiff with SLE

8  and also inflammatory arthritis for which he started her on medication and ordered

9  testing.  (A.R. 401; 27.)

10

11      On May 19, 2010, Plaintiff "reported intermittent swelling of the legs, and Dr.

12  Ahluwalia noted that laboratory testing showed a nephrotic range of proteinuria."

13  The tests, which are part of the record, (A.R. 271-79) are interpreted only so far as

14  they suggest elevated levels of protein in the urine (i.e. showing a nephrotic range of

15  proteinuria.) [3]  (A.R. 27; 398-99.)  The test results caused Dr. Ahluwalia to suspect

16  lupus nephritis, a complication of SLE that affected the kidneys, and order a renal

17  biopsy.  (A.R. 398-99.)

18

19      On September 28, 2010 Plaintiff returned to Dr. Ahluwalia.  His notes from

20  the visit stated the renal "biopsy showed membranous lupus nephritis."[4]  (A.R. 400.)

21  At s subsequent examination on November 9, 2010, Dr. Ahluwalia re-affirmed the

22  diagnoses of SLE and lupus nephritis.  (A.R. 397.)  Dr. Ahluwalia ordered a genetic

23  test to gage Plaintiff's response to medication, which yielded "an abnormal result,"

24  indicated that Plaintiff had a genetic mutation or deficiency whereby the TPMT

25

26  [3] Plaintiff asserts that the tests show evidence of decreased C3 and C4 complements, elevated specific gravity,
elevated protein and total creatinine in the urine; and positive RNP autoantibodies, Smith antibodies, and SS-A

27  antibodies. (Joint Stip. at 7-8.)
[4] The ALJ misattributes the renal biopsy and its results to Plaintiff rather than to her treating physician who was

28  actually the source of that information, having ordered the biopsy, received the test results, and interpreted them.
(A.R. 27; 400.)

1   enzyme that is involved in the metabolizing of certain drugs, was not functioning

2   properly.  (A.R. 280-84.)  A December 2010 follow-up examination revealed trace

3   synovitis in the scattered metacarpal and phalangeal joints.  (A.R. 396.)  A

4   comprehensive metabolic panel on December 22, 2010, showed elevated levels of

5   creatinine, protein, and overall protein/creatinine ratio; elevated DNA antibodies, a

6   low C4C component, as well as elevated protein in the urine.  (A.R. 285-87.)

8       A May 9, 2011 follow-up examination with Dr. Ahluwalia, was

9   unremarkable, by Plaintiff's own admission.  (A.R. 394; Joint Stip. at 10.)

10  However, a "lupus panel" on August 22, 2011, once again showed high anti-DNA

11  antibodies, low C3C and C4C complements, and high protein/creatinine levels in the

12  urine (A.R. 290.)  At her December 2011 follow-up, Plaintiff complained of low

13  back and hip pain despite taking morphine and Vicodin.  On January 18, 2012, Dr.

14  Ahluwalia's examination revealed osteoarthritic changes in the hands and he again

15  affirmed the diagnoses of SLE, osteoarthritis of the hands, and degenerative disc

16  disease of the lumbar spine.  (A.R. 392.)  Blood and urine tests dated January 19,

17  2012 revealed abnormally high protein levels in the urine with a high protein to

18  creatinine ratio; a low A/G ratio; and elevated anti-DNA antibodies.  (A.R. 292-94.)

19  In May 2012, Dr. Ahluwalia wrote that Plaintiff's clinical profile was still consistent

20  with SLE but wrote in "review of systems" that "lupus was negative."[5]  (A.R. 391.)

22      On February 1, 2013, Dr. Ahluwalia completed an SLE Impairment

23  Questionnaire provided by Plaintiff's lawyers, affirming that Plaintiff met the

24  American College of Rheumatology's diagnostic criteria for SLE (namely that she

25  displayed at least 4 of the eleven listed signs or symptoms.)  (A.R. 451-52.)  Using a

26  check-list, Dr. Ahluwalia specified that Plaintiff showed the following signs or

28  [5] In between visits to Dr. Ahluwalia, Plaintiff presented to the Emergency Room with complaints of severe pain, but the diagnoses and discharge did not suggest any disabling illness.  (*See, e.g.* A.R. 27-28.)

symptoms: (1) malar rash, (2) photosensitivity, (3) oral ulcers, (4) arthritis, (5) anti DNA antibody, and (6) positive test for ANA. (*Id*.) Notably, Dr. Ahluwalia did not check the line next to "Renal involvement shown by a) persistent proteinuria shown by: (greater than 0.5gm or (3+ test sticks or b) cellular casts," but did check "yes" in response to the question "Is there evidence of renal involvement?" (*Id*.) With respect to that check mark, and nearly all others on the form, the space provided in the questionnaire under "Describe" is blank. (A.R. 452.)

With respect to limitations on work, as indicated in the form, Dr. Ahluwalia estimated that, in a regular, eight-hour workday, Plaintiff could sit no more than a total of two hours; stand and/or walk no more than one hour; and lift and carry no more than five pounds frequently and ten pounds occasionally. (A.R. 454-55.) Further, he indicated in the form, that her symptoms would interfere "frequently" with her attention and concentration, she would be incapable of tolerating even a "low stress" work environment, would need to take three to four breaks lasting about half an hour each, and would likely miss two to three workdays a month due to her impairments. (A.R. 455-56.)

In addition, Dr. Ahluwalia provided a letter dated March 5, 2013, that summarized the February 2013 SLE Impairment Questionnaire in narrative form. (A.R. 467.) Dr. Ahluwalia's letter re-affirmed the same diagnoses, symptoms, and limitations indicated on the form. (A.R. 467.) In his letter, he wrote that his examinations of Plaintiff revealed malar rashes, photosensitivity, oral ulcers, arthritis of the proximal interphalangeal joints and metacarpals, and anti DNA antibodies. (A.R. 467.)

//

//

//

1
2

### Non-examining State Agency Physicians' Assessments.

3      On May 1, 2012, a non-examining state agency physician, Dr. Fahlberg,

4  opined that Plaintiff was not disabled, and though she had SLE, her condition was

5  not severe enough to qualify for benefits.  (A.R. 75-94.)  The opinion was based on

6  a phone conversation with Plaintiff, and review of Plaintiff's medical records,

7  including those of her treating physicians, Dr. Ahluwalia and Dr. Mueller from

8  November 30, 2011 to April 10, 2012.  (A.R. 76-78.)

9

10      On June 20, 2012, a non-examining state agency physician, Dr. B. Harris

11  similarly found Plaintiff to be "non-disabled" and assessed identical limitations as

12  Dr. Fahlberg, based on a review of the same materials as Dr. Fahlberg but with

13  additional treatment reports Plaintiff's treating physicians.  (A.R. 97-116.)

14

15                              **DISCUSSION**

16

17      **Applicable Law Regarding the Weight of  Medical Opinions.**

18

19      In Social Security cases, courts give different degrees of deference to medical

20  opinions depending on whether the opinion is that of a "treating physician,"

21  "examining physician," or "nonexamining physician."  *Garrison v. Colvin*, 759

22  F.3d 995 1012 (9th Cir. 2014) (citation and quotation marks omitted).  Generally, a

23  treating physician's opinion is given "controlling weight" when it is "well-

24  supported by medically acceptable clinical and laboratory diagnostic techniques

25  and is not inconsistent with the other substantial evidence in [the Plaintiff's] case

26  record[.]"  *Orn*, 495 F.3d at 631 (citations and quotation marks omitted); *see also*

27  20 C.F.R. § 404.1527(c)(2).  An examining, but non-treating physician's opinion is

28  entitled to less eight than that of a treating physician, but more weight than a

nonexamining physician's opinion. *Id.* (citation omitted).

However, a treating physician's opinion is not necessarily conclusive, as to a plaintiff's medical condition or disability. *Margallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted.) An ALJ may reject a treating physician's uncontroverted opinion by providing "clear and convincing reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted). An ALJ may reject a treating physician's opinion that conflicts with another doctor's opinion "by providing specific and legitimate reasons that are supported by substantial evidence." *Garrison,* 759 F.3d at 1012 (citation and footnote omitted).

**1. The ALJ Did Not Provide Specific and Legitimate Reasons For Rejecting the Opinions of Plaintiff's Treating Physicians.**

Here, the ALJ's wholesale adoption of Plaintiff's evaluation by non-examining, state agency physicians, of unknown specialization, is legal error insofar as the ALJ fails to provide specific and legitimate reasons for rejecting the opinions of Plaintiff's treating physicians. Typically the opinions of treating physicians are afforded greater weight than those of non-treating physicians, while opinions of non-treating, non-examining physicians are generally weighted the lowest. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2.)

"Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record." *Orn*, 495 F.3d at 632 (internal quotation marks and citations omitted.) This can be done by setting out a detailed

and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id*.

Here, the ALJ states simply that "the State Agency review physicians determined that the [SLE] impairment was severe but that it did not meet or equal a listed impairment and that [Plaintiff] was capable of lifting and carrying 25 pounds occasionally and 20 pounds frequently; standing and walking for 6 hours out of an 8-hour workday; sitting for 6 hours out of an 8-hour workday; occasional climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs; frequent stooping, kneeling, crouching, and crawling; and unlimited balancing." (A.R. 31.) The ALJ provides no reference or support for these evaluations. Next the ALJ states that "[t]he State Agency review psychiatrists did not find that [Plaintiff] had a mentally determinable mental impairment," and references the disability determinations by two non-examining state agency physicians (of unknown specialization)[6]: Dr. Fahlberg and Dr. Harris.

Lastly, the ALJ states that he "concurs and adopts the opinions of the State Agency review physicians as their assessments are supported by the overall evidence." (A.R. 31.) However, the ALJ does not identify what specific evidence supported the state agency review physicians' assessments. Even if the ALJ had specified the evidence that supported the state agency physicians' assessments, "nonexamining physicians' conclusion[s], with nothing more, does not constitute substantial evidence, particularly in view of the conflicting observations, opinions,

---

[6] This is relevant because an ALJ "generally gives more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5.) Moreover, the agency has "acknowledged the importance of specialized knowledge of the *particular* disease suffered by [Plaintiff]. During the notice and comment period of a proposed rulemaking, the agency heard concerns that doctors without specialized training "may not have an understanding of 'emerging illnesses,' such as . . . *lupus erythematosus*." *Reed v. Massanari*, 270 F.3d 838, 845 (9th Cir. 2001) (quoting Federal Old-Age, Survivors, and Disability Insurance and Supplemental Security Income for the Aged, Blind, and Disabled; Evaluating Opinion Evidence, 65 Fed. Reg. 11866, 11872 (March 7, 2000) (emphasis added))

and conclusions of an examining physician," as existed in this case.  *See Pitzer v. Sullivan*, 908 F.2d 502, 506 n. 4 (9th Cir. 1990.)

### a.  The ALJ Improperly Discounted Dr. Mueller's Assessment.

The ALJ summarized the findings in Dr. Mueller's Multiple Impairment Questionnaires and rejected them because the treatment notes either: (1) indicated normal results, largely through check-box findings, and were not indicative of any debilitating condition; or (2) contained illegible handwriting.  (A.R. 29-32.)

### i.  Dr. Mueller's Treatment Notes were Consistent with his Assessment.

The Ninth Circuit has held that the ALJ may "permissibly reject[ ] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions." *Molina*, 674 F.3d at 1111.  However, the use of check boxes should not foreclose all evidentiary value of a report.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding that treating physician's opinion that was "unsupported by rationale or treatment notes, and offered no objective medical findings" to support diagnoses was properly rejected.)  Though Dr. Mueller's two Multiple Assessment Questionnaires do not contain an extensive narrative they do reference the "positive clinical findings that demonstrate and/or support [his] diagnosis."  (A.R. 458.)

The 2012 Questionnaire references chronic pain in specific terms, as "burning stiffness[,] loss of range of motion and [ ] discomfort," describing its frequency as "daily," and its precipitating factors as "daily activities, stress, weather."  (A.R. 427-28.)  The 2013 Questionnaire also references pain in terms of "burning, sharp, dull pressure," in "all extremities incl[uding] shoulders, elbows, knees , hips, feet and back," describing its frequency as "constant," and precipitating factors as "any

physical activity." (A.R. 459-60.) "Where evidence is susceptible to more than one rational interpretation," this Court has a duty to uphold the ALJ's findings. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005.) However, in light of repeated references to Plaintiff's conditions of disability (i.e. SLE, membranous nephritis, and their attendant symptoms of pain) in Dr. Mueller's treatment notes (*see* A.R. 406-24) it is difficult to imagine a rational interpretation that would lead to the conclusion that Plaintiff did not suffer any "debilitating changes." (A.R. 31.)

### ii.     The ALJ Improperly Discounted Dr. Mueller's Treatment Notes Based on Illegible Handwriting.

The ALJ also discounted Dr. Mueller's opinion while noting that some of his handwritten notes were illegible. (*Id*.) Upon review of the record, Dr. Mueller's treatment notes are, for the most part, indecipherable due to illegible handwriting. It also appears that the typewritten documents in the treatment record indicate (1) "no acute fracture" in the right hip, (2) "no significant abnormality of the lumbar spine," from a January 17, 2012 x-ray, and (3) "negative right hip" after a November 17, 2010 x-ray of the right hip. (A.R. 410-11; 423.) However, as previously noted, a "carotid evaluation" from an ultrasound resulted in the following findings: "Real-time imaging of the carotid systems reveals plaquing of the right bulb. Doppler analysis reveals normal peak systolic velocities bilaterally. Vertebral flow is antegrade bilaterally," and "0-39% stenosis of the internal carotid arteries bilaterally." (A.R. 420-21.) Further, it is not entirely clear as to what the significance, if any, is of the other test results in the record. (*See, e.g.*, A.R. 415; 419.) While the term "normal" does appear in Mr. Mueller's compilation of Plaintiff's objective medical data (particularly in the results of x-rays showing an absence of fractures or spinal abnormalities), a review of the overall evidence in the record—including the parts of Dr. Mueller's notes that are legible, notes from

15

Plaintiff's other treating physician, and test results ordered by Plaintiff's other treating physician—shows it is consistent with Dr. Mueller's assessment.

Even if Dr. Mueller's assessment were inconsistent with the record as a whole, the ALJ erred in discarding Dr. Mueller's assessment on the basis that his treatment notes were illegible.  This is because the ALJ was duty-bound to seek clarification from the medical source before discarding it based on "illegible handwriting."  (Joint Stip. at 16)  The tension, if any, between the ALJ's duty to seek clarification under 20 C.F.R. § 404.1512(e), and the Court's duty to uphold the ALJ's conclusion "[w]here evidence is susceptible to more than one rational interpretation," is resolved in favor of the Plaintiff in this case because federal courts have held that where a "physician's documentation is illegible and, therefore, inadequate to allow for proper evaluation of the medical evidence," the "ambiguity triggers the ALJ's duty to develop the record."  *Burch*, 400 F.3d at 679; *Tonapetyan*, 242 F.3d at 1150 (The ALJ "has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered.")  *See also Williams v. Colvin*, 2015 U.S. Dist. LEXIS 152783, **7-8 (W.D. Wash. Nov. 10, 2015); *Manso-Pizarro v. Sec'y of Health & Human Servs*., 76 F.3d 15, 19 (1st Cir. 1996) (holding that "unreadable entries may have some import. We think that it is the duty of the ALJ, on remand, to make some effort to decipher them.")  Therefore, the ALJ's dismissal of Dr. Mueller's opinion, in part, on the basis that his handwriting was illegible, was improper.

### b.  The ALJ Improperly Discredited Dr. Ahluwalia's Assessment.

The ALJ discounted Dr. Ahluwalia's opinion, seemingly in its entirety, on the grounds that his opinion was (1) unsupported by objective findings, and (2)

16

1   inconsistent with his treatment notes and with the record as a whole.  (A.R. 31.)  The

2   Court finds the ALJ's rejection of Dr. Ahluwalia's assessment to be legal error.

3

4         **i.  Dr. Ahluwalia's Assessment was Supported by Objective**

      **Medical Evidence.**

5

6         Specifically, the ALJ found that Dr. Ahluwalia failed to provide "objective

7   findings of revealed malar rashes, photosensitivity, oral ulcers, arthritis of the

8   proximal interphalangeal joints and metacarpals."  (*Id*.)  The ALJ also stated that

9   Plaintiff "seldom has more than trace synovitis," and that "[t]here is no medical

10   evidence documenting fibromyalgia."  (A.R. 29.)

11

12         An ALJ may properly reject a physician's opinions where the physician's

13   conclusions do not "mesh" with the patient's objective data or history.  *Tommasetti*

14   *v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008*)* (finding that the incongruity between

15   the limitations listed by the physician—which lacked support in the patient's

16   medical records—provided a specific and legitimate reason for rejecting that

17   physician's opinion of the patient's limitations);  *Rollins v. Massanari*, 261 F.3d

18   853, 856 (9th Cir. 2001) (ALJ properly discounted physician's limitations as "not

19   supported by any findings".)

20

21         An ALJ "need not accept the opinion of any physician, including a treating

22   physician, if that opinion is brief, conclusory and inadequately supported by clinical

23   findings."  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *see also* 20

24   C.F.R. § 404.1527(c)(2); *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)

25   (finding that an ALJ properly rejected physician's determination where it was

26   "conclusory and unsubstantiated by relevant medical documentation.")

27

28

1       However, the nature of Plaintiff's diagnoses is noteworthy in this case. The

2 Ninth Circuit has recognized "the difficulty of diagnosing [SLE], which has been

3 known to require continuous reevaluation by doctors when new symptoms develop."

4 *Poppa v. Comm'r of SSA*, 1999 U.S. App. LEXIS 30184, **3-4 (9th Cir. Nov. 18,

5 1999.)  Indeed, like many other SLE patients, Plaintiff's "diagnoses have shifted

6 over time," and in such circumstances, it is particularly critical that the ALJ consider

7 a treating physician's opinion and Plaintiff's own SLE-induced "pain and fatigue

8 complaints." *Id*.

9

10       Similarly "[f]ibromyalgia[7] has previously been described by [the Ninth

11 Circuit] as 'a rheumatic disease' with symptoms that include 'chronic pain

12 throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep

13 disturbance that can exacerbate the cycle of pain and fatigue.'" *Rounds v. Comm'r,*

14 *SSA*, 795 F.3d 1177, 1181 (9th Cir. 2015) (quoting *Benecke v. Barnhart*, 379 F.3d

15 587, 589-90 (9th Cir. 2004.))    The Ninth Circuit has recognized that

16 "[f]ibromyalgia's cause is unknown, there is no cure, and it is poorly-understood

17 within much of the medical community;" moreover, fibromyalgia is "diagnosed

18 entirely on the basis of patients' reports of pain and other symptoms" and "there are

19 no laboratory tests to confirm the diagnosis." *Rounds*, 795 F.3d at 1181 (quoting

20 *Benecke*, 379 F.3d at 590.)    Under these guidelines, Plaintiff's fibromyalgia

21 diagnosis is consistent with the described symptoms and the prescribed medications

22 for pain.

23

24       With respect to the ALJ's reference that certain symptoms were corroborated

25 by objective evidence only "on a few occasions," this characterization is an

26 improper ground for rejecting a treating physician's opinion. *Orn*, 495 F.3d at 632

27

28

---

[7] Though it is not named as one of Plaintiff's disabling conditions in her application for benefits, the discussion of fibromyalgia is relevant because Dr. Ahluwalia diagnosed Plaintiff with fibromyalgia and the ALJ discredited his assessment partly based on the reason that his diagnoses were unsupported by objective evidence.

(citing *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988) (holding that an ALJ may not offer his own conclusions but must set forth his own interpretations of conflicting clinical evidence and explaining why they, rather than the doctor's, are correct.)

### ii.    Dr. Ahluwalia's Findings were Consistent with his Overall Treatment Notes.

With respect to the conclusion that Dr. Ahluwalia's findings that were inconsistent with his treatment notes, the ALJ noted that Dr. Ahluwalia "consistently reported that [Plaintiff] has no oral ulcer; her joints had no synovitis and were not tender, and they had a full range of motion. . . that [Plaintiff] reported no photosensitivity, rash, or ulcers . . . had only trace synovitis in the MCP and PIP joints bilaterally of the index and long fingers, and those symptoms were only on a few occasions."  (A.R. 31.)  Nevertheless, Dr. Ahluwalia indicated in both SLE Impairment Questionnaires and his March 5, 2013 letter, that Plaintiff had malar rashes, photosensitivity, and oral ulcers.  (A.R. 451-57; 467.)

It may appear that Dr. Ahluwalia's treatment notes, which unequivocally stated that no rash was found, are inconsistent with the SLE Impairment Questionnaire and letter which indicate that a rash was present.  However, the presence of other signs and symptoms in the Questionnaire, such as synovitis, arthritis, and renal involvement are consistent with both Dr. Ahluwalia's treatment notes and the objective evidence in the record.  (*See e.g.* A.R. 271-87; 290; 292-94; 392; 396.)  The Ninth Circuit has held that "although the ALJ found a few inconsistencies in [a doctor's] treatment notes, [if] the physician's records document his conclusions," the ALJ should re-consider that doctor's opinion.  *Goulart v. Colvin*, 604 F. App'x 585, 586 (9th Cir. 2015)(citing *Orn*, 495 F.3d at 631-33.)

"A conflict between treatment notes and a treating provider's opinions may [typically] constitute an adequate reason to discredit the opinions of a treating physician or another treating provider." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citing *Molina*, 674 F.3d at 1111-12.)   However, in this case, "substantial evidence does not support the ALJ's conclusion that the [overall] opinions of [the treating physicians] were inconsistent with the treatment notes," which indicated that Plaintiff regularly suffered the symptoms typical of her condition, and several tests and objective data corroborated the existence of those symptoms (*e.g.* renal involvement, trace synovitis, arthritis, proteinuria.)   *Id.* Therefore, the inconsistency between Dr. Ahluwalia's treatment notes and his assessment of Plaintiff's limitations, is not sufficient to support the ALJ's finding that Dr. Ahluwalia's assessment did not "mesh" with the objective data and lacked support in Plaintiff's medical records.

To the extent that the ALJ finds Dr. Ahluwalia's assessment inconsistent with Plaintiff's daily activities, the Court finds this determination too is not supported by substantial evidence.   The Plaintiff's limited daily activities are not in tension with the opinions of her treating providers.   *See Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 600-02 (9th Cir. 1999) (considering an inconsistency between a treating physician's opinion and a claimant's daily activities a specific and legitimate reason to discount the treating physician's opinion); *Smolen v. Chater*, 80 F.3d 1273, 1284 n. 7 (9th Cir. 1996) (holding that a claimant need not be completely incapacitated to receive benefits.)

The outcome of this case turns on the ALJ's finding that although Plaintiff suffers from SLE and other impairments—in contrast to her treating physicians' assessment—the severity of those impairments is not sufficient for a finding of disability.   (A.R. 29.)   "An ALJ may find an impairment not severe 'only if the

1    evidence establishes a slight abnormality that has no more than a minimal effect on

2    an individual's ability to work.'  *Wick v. Barnhart*, 173 F. App'x 597, 600 (9th Cir.

3    2006) (quoting *Webb v. Barnhart*, 433 F.3d 683, 2005 WL 3544685, at *3 (9th Cir.

4    2005).)  On this record, the ALJ did not identify substantial evidence supporting  the

5    finding that Plaintiff's impairments were nonsevere.[8]  *Id.*

6

7    **2.  The ALJ Erred in Determining that Plaintiff was Not Credible.**

8

9                              **Applicable Law**

10

11        The ALJ is responsible for determining credibility, resolving conflicts in

12   medical testimony, and for resolving ambiguities.  *Reddick v. Chater*, 157 F.3d 715,

13   722 (9th Cir. 1998) (quoting *Andrews*, 53 F.3d at 1039.)  "In assessing the

14   credibility of a claimant's testimony regarding subjective pain or the intensity of

15   symptoms, the ALJ engages in a two-step analysis."  *Ghanim*, 763 F.3d at 1163.

16   First, the ALJ must determine whether the claimant has presented objective medical

17   evidence of an underlying impairment which could reasonably be expected to

18   produce the pain or other symptoms alleged."  *Id.* (quoting *Vasquez v. Astrue*, 572

19   F.3d 586, 591 (9th Cir. 2009).)  "If the claimant meets the first test and there is no

20   evidence of malingering, the ALJ can only reject the claimant's testimony about the

21   severity of the symptoms if she gives 'specific, clear and convincing reasons' for the

22   rejection."  *Id.* (quoting *Vasquez*, 572 F.3d at 591.)

23

24        "General findings are insufficient; rather, the ALJ must identify what

25   testimony is not credible and what evidence undermines the claimant's complaints."

26   *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996.)  The ALJ's finding must be

27   ─────────────────────

28   [8] To the extent that the ALJ found the impairments nonsevere *because* they did not rise to the level of "an incapacitating or debilitating medical condition," rather than evaluating whether Plaintiff could work on a sustained basis, the ALJ used the wrong standard.  *Benecke*, 379 F.3d at 594; *see also* A.R. 24-25.

supported by specific, cogent reasons.  *Id*. (quoting *Rashad v. Sullivan*, 903 F.2d 1229, 1231(9th Cir. 1990).)  *See also Treichler v. Comm'r of Soc. Sec. Admin*., 775 F.3d 1090, 1102 (9th Cir. 2014) (affirming two-step credibility standard of review, citing *Lingenfelter*, 504 F.3d at 1036; *Smolen*, 80 F.3d at 1281.)

"The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing." *Chaudhry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012) (quoting *Tommassetti*, 533 F.3d at 1039.)

"Because pain is a subjective phenomenon . . . it is possible to suffer disabling pain even where the degree of pain, as opposed to the mere existence of pain, is unsupported by objective medical findings." *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  Therefore, the Ninth Circuit has held that once a plaintiff "submits objective medical evidence establishing an impairment that could reasonably be expected to cause some pain, 'it is improper as a matter of law for an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings.'" *Id*. (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) (*per curiam*).)

//

//

//

//

a.      The Documented Evidence of Pain in the Record.

Plaintiff's physical impairments are closely related to, and largely influenced by, worsening pain documented in the record as follows:

Since September of 2010, her symptoms have worsened (A.R. 48.) The pain is located throughout her body, in all her muscles and joints, and persists daily (A.R. 49.) She sometimes cannot extend her arms because of the muscle tightness and the stiffness in her shoulders (A.R. 50.) Her fingers and hands sometimes swell, such that she cannot bend her wrists (A.R. 50.) Her hips, ankles, feet, and toes hurt, which affects her ability to walk (A.R. 50.) She sits, reclines, or lies down, depending on what is most tolerable at the time, before walking around the house to "stretch out a little bit" (A.R. 51.) She can only sit for about one to two hours before needing to lie down or stand up; she can stand no more than about 20 minutes before the pain flares; she can walk about a block-and-a-half before needing to sit; and she can only lift about five pounds (A.R. 52, 67.) As an example of her difficulty grasping objects, she noted how her hands start to cramp when holding a fork, such that it will fall out of her grasp (A.R. 53.) She also has difficulty with fine manipulation such that she even has difficulty manipulating papers or a keyboard after one to two minutes (A.R. 61-62.) She cannot bend at the waist more than "half way" and cannot kneel with her knees on the floor (A.R. 53.) She finds that her medications only control the pain "[a]t times" (A.R. 49.) The medications make her drowsy on a daily basis, and also make her nauseous, and cause a ringing in her head such that she needs to go rest or nap (A.R. 59.) She generally naps throughout the day for an hour each time (A.R. 60.) She also wears wrist braces that she bought over-the-counter and sometimes relies on her husband's unspecified assistive device when she is tired or folding laundry (A.R. 55-56.)

1

2    (Joint Stip. at 4.)

3

4        **b.**     **The ALJ Erred in Discrediting Plaintiff's Subjective**
             **Statements.**
5

6        The ALJ found that (1) Plaintiff suffers from SLE which could reasonably

7    produce the symptoms complained of, and (2) found no evidence of malingering.

8    (A.R. 27.)  The ALJ nevertheless concluded that Plaintiff's "statements concerning

9    the intensity, persistence and limiting effects of these symptoms are not entirely

10   credible."   (*Id*.)   Although the ALJ offered specific reasons for his adverse

11   credibility determination, the ALJ's reasons are not supported by *substantial*

12   evidence and thereby do not satisfy the clear and convincing requirement.

13   *Lingenfelter*, 504 F.3d at 1036 (holding that an ALJ's reasons must be both specific

14   in nature and supported by substantial evidence.)

15

16       The ALJ's first specific reason was that Plaintiff's "described limitations are

17   not supported by the evidence." (A.R. 30.)  The ALJ appears to be referring to the

18   limitations described in the function report that Plaintiff completed (which he found

19   to corroborate that of Plaintiff's daughter), that she has difficulty bathing and

20   requires assistance using the toilet.  (A.R. 29-30.)  However, an ALJ may not

21   discredit subjective complaints simply because they are not substantiated by

22   objective medical evidence.  *See Fair*, 885 F.2d at 601.

23

24       Moreover, the medical evidence demonstrates that at least some instances of

25   Plaintiff's subjective complaints of pain were substantiated.  For example, the ALJ

26   noted that on April 6, 2010, Plaintiff presented to Dr. Ahluwalia complaining of

27   muscle and joint stiffness; a physical examination revealed "trace synovitis in the

28

index, longer finger, and MCP and PIP joints bilaterally with tenderness."  (A.R. 27.)  The ALJ also noted that on May 19, 2010, Plaintiff "reported intermittent swelling of the legs, and Dr. Ahluwalia noted that laboratory testing showed a nephrotic range of proteinuria."  (A.R. 27.)  Both these instances suggest that Plaintiff's subjective complaints were consistent with the objective medical evidence.

The ALJ also found that the record did not demonstrate that Plaintiff was medically advised or prescribed the use of any assistive device despite her testimony that she used wrist splints or her husband's walker.  (A.R. 26.)  In light of the abundant evidence of Plaintiff seeking treatment for her subjective complaints of pain,  the ALJ's finding of Plaintiff's implied "failure" to seek official sanction for the use of assistive devices is not supported by substantial evidence.  *Orn*, 495 F.3d at 638 (holding that failure to seek treatment, when complaining of disabling pain, may be probative of credibility, because a person's normal reaction is to seek relief from pain.)  In contrast to cases where an ALJ's adverse credibility determination has been upheld—based on a finding that the plaintiff's  medical records show a higher level of functionality, that the plaintiff has been uncooperative regarding use of medications, and that the plaintiff appears to access support resources only when she has secondary motivations—here, Plaintiff's medical records do not show a higher level of functionality than that self-described, Plaintiff was not uncooperative regarding use of medication, and Plaintiff accessed support resources like her husband's walker—just to get by—even when they were not prescribed or otherwise noted in the record.  *Rounds*, 795 F.3d at 1186.

Lastly, the ALJ found that Plaintiff's activities of daily living contradicted the level of impairment she claimed.  (A.R. 26-29.)  In support of this conclusion, the ALJ points  to Plaintiff's testimony that she drives 5 to 10 miles daily to the grocery

store, her daughter's school, and to doctor's appointments; she shops with her family and picks up cans and boxes, helps her husband with daily tasks.  (A.R. 29.)

While an "ALJ may reject a claimant's symptom testimony if the claimant is able to spend a substantial part of her day performing household chores or other activities that are transferable to a work setting . . . this line of reasoning has its limits. The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1284 (citing *Fair*, 885 F.2d at 603.)

In this case, Plaintiff's need for rest and medication including morphine, Vicodin, valium, Xanax, and prednisone, is heavily documented in the record. (A.R. 430, 455, 462.)  Furthermore, where a plaintiff continually sought and received treatment for pain, an ALJ errs in reasoning that the plaintiff's complaints were inconsistent with her activities and the degree of treatment she required. *Nguyen v. Chater*, 172 F.3d 31.  Indeed, where doctors cannot find a specific cause for a plaintiff's plain, the fact that they prescribed potent pain medications have led courts to conclude that the ALJ failed to produce substantial evidence to discredit the plaintiff's subjective complaints.  *See Crosby v. Apfel*, 248 F.3d 1157. Plaintiff's daily activities alone may not form the substantial evidence that an ALJ uses to discredit a plaintiff's subjective testimony.  *See Wick*, 173 F. App'x at 599 (citing *Fair*, 885 F.2d at 603.)

Accordingly, the ALJ's reasons for discounting Plaintiff's credibility are either unsupported by substantial evidence in the record or otherwise insufficient to undermine her credibility.  On that basis, the ALJ's denial of benefits must be

reversed and remanded for further administrative proceedings to correct the legal errors identified in the ALJ's decision.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED and this matter is remanded for further proceedings consistent with this Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: November 25, 2015

_____
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE